UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SAM DAVIS and MARK PICKENS,       )
                                  )
        Plaintiffs,               )
                                  )
v.                                )    No. 3:03-1228
                                  )    JUDGE ECHOLS
CITY OF BRENTWOOD, BILLY          )
COOPER, and MARK URSERY,          )
                                  )
        Defendants.               )

## MEMORANDUM

Pending before the Court are the Motion for Summary Judgment on Behalf of Defendant City of Brentwood (Docket Entry No. 85), Defendant Billy Cooper's Motion To Dismiss and For Summary Judgment (Docket Entry No. 94), and the Motion for Summary Judgment on Behalf of Defendant Mark Ursery (Docket Entry No. 82), to which Plaintiffs have responded in opposition, and Defendants have filed replies.

Plaintiffs Sam Davis ("Davis") and Mark Pickens ("Pickens") are African Americans who filed this action on December 19, 2003, against the City of Brentwood ("the City"), and two of Plaintiffs' white former co-workers, Billy Cooper ("Cooper") and Mark Ursery ("Ursery"), alleging racial discrimination and harassment in employment. On February 4, 2004, Plaintiffs filed a First Amended Complaint.

1

In Count I, brought against the City under 42 U.S.C. § 2000e *et seq.* ("Title VII"), Plaintiffs alleged the City denied Pickens the opportunity for promotion to a supervisory position because of his race and replaced him with a less qualified white person; the City discriminated against Davis and Pickens on the basis of race in the terms, conditions, and privileges of their employment; and the City engaged in, condoned, tolerated and ratified harassing and systemic discriminatory conduct of its managers, supervisors and employees which resulted in a racially hostile work environment. In Count II, both Plaintiffs alleged that the City, Cooper and Ursery subjected them to racial discrimination and harassment under 42 U.S.C. § 1981.

In Count III, both Plaintiffs alleged under 42 U.S.C. § 1983 that the City, through its policymakers and supervisors, maintained policies and customs to investigate inadequately and improperly incidents of employee misconduct; to supervise and train inadequately city employees; and to tolerate acts of employee misconduct which resulted in violation of Plaintiffs' rights under Title VII, § 1981, and the Equal Protection Clause of the Fourteenth Amendment. In Count IV, both Plaintiffs alleged that the City's unlawful discriminatory practices violated the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.* In Count V, both Plaintiffs alleged that Defendants Cooper and Ursery intentionally inflicted emotional distress on Plaintiffs by tying

2

a stuffed gorilla to the back of a City truck and driving the truck around the City of Brentwood during work hours.

Plaintiff Davis retired from his employment with the City after this litigation began. The City terminated the employment of Plaintiff Pickens in November 2004, but that termination is not at issue in this case. Plaintiffs request compensatory and punitive damages, reasonable attorney's fees, the costs of litigation, and other relief the Court deems proper. They also ask for injunctive relief in the form of an order compelling compliance with equal employment opportunity laws, posting of regulatory posters, and sensitivity training for all City employees. Defendants contend that certain of Plaintiffs' claims are time-barred and that Plaintiffs fail to establish the elements of their claims. For purposes of the summary judgment motions, the following facts are undisputed, they are taken in the light most favorable to Plaintiffs, or factual disputes are noted.

## I.  FACTS

Davis, who has a sixth-grade education, worked for the City in the position of Maintenance Worker I in the Parks Department and in the Public Works Department between 1985 and May 2005. Pickens worked in the Parks, Public Works, and Water & Sewer Departments from 1988 until his termination in November 2004. He was employed in the position of Maintenance Worker I until 1995 when he was promoted to Maintenance Worker II. All of the City maintenance

3

departments are located in a building known as the "service center."

In his first four years of employment between 1985 and 1989, Davis did not have any complaints about his work environment. During the years 1988 through 1995, Davis and Pickens claim they were subjected to racial harassment which included assertions of unequal distribution of work and the use of racially derogatory terms, comments, and jokes by co-workers and supervisors.

In 1989, Davis heard white co-worker Danny Lampley say, "Look at that goddam nigger running that dozer." When Davis looked at him and said, "Danny," Lampley stated, "Excuse me. I ain't used to being around black people." (Davis Depo. at 142.) Later, observing a black man driving by, Lampley said, "Look at that goddamn nigger driving that nice car." When Davis said, "Danny, I thought you weren't going to say that no more," Lampley answered, "Oh, I'm sorry." (Id. at 146.)

On another occasion, Davis and other workers were standing in line to clock out. Davis made a comment that Roy Spooner, a white supervisor, was taking credit for work he was not doing. Davis said, "Roy ain't doing all that work because I'm showing Roy a lot of things that he didn't know." Davis's white co-worker, Keith Mangrum answered, "That's not what a nigger supposed to do." (Id. at 148.) On another occasion, Davis told a white co-worker, Stephen Tomlinson, that he was thinking about retiring at age 62.

4

Tomlinson said, "You can take your black ass out of here. You can retire now." When Davis reacted to the comment, Tomlinson said, "Oh, I was just joking." (Id. at 152-154.) Davis also heard Tomlinson say that, if "he ever caught his daughter dating a black man, he would kill the hell out of both of them." (Id. at 376.)

Prior to 1995, Pickens testified he recalled hearing co-workers talk about getting blacks to do jobs they did not want to do. He also recalled that black workers had to work more than one week in a row on the chipper truck whereas white workers did not. Pickens overheard co-workers tell racially insensitive jokes on occasion and both Plaintiffs heard co-workers use the term "nigger" quite a few times.[1] That term was not specifically directed to the Plaintiffs. Pickens testified his uniform was stomped on and covered with something that appeared to be feces. As a result, he took his uniforms home and washed them, even though the City provided uniform service. Some of these incidents Pickens reported to a supervisor and others he did not.

While Pickens worked in the Parks Department, Kay Ward asked him to serve as supervisor of the parks crew. Pickens directed the work of Plaintiff Davis and Ernie Martin. Ward then hired Spooner, who is white. Ward called Pickens into her office and asked if he

---

[1] Defendant Cooper heard Pickens refer to white people as "crackers." (Cooper Depo. at 49.) Cooper testified Davis often engaged in horseplay and tried to scare people and play jokes. (Id. at 48-49.)

5

had a high school diploma. Pickens stated he did, and Ward asked him to bring it in. When Pickens told Ward he was having trouble finding the diploma, Ward told him he could not be a supervisor unless he had one. She placed Spooner in the supervisor position. When Pickens found his diploma about a week later, Ward told him he did not have enough experience for the job. Pickens considered this to be a demotion, although his wages were not decreased.

Pickens testified that Spooner always called him "boy" and did not use his name, even though Pickens asked him to use his name. Spooner also made racially insensitive and derogatory comments, including telling a worker to turn off the radio because a black woman was giving the weather report and "black people [don't] know nothing about the weather." (Docket Entry No. 106, Pickens Depo. at 68.) Spooner also said the only "black person he liked was Vanessa Williams." (Id. at 79.) Davis heard Spooner refer to a black, female firefighter with the words, "Ain't no way in you-know-what I'd let a black-ass nigger woman bring me down out of a fire. I'd burn up in there." Davis looked at him and replied, "I don't care who gets me out of a fire." (Davis Depo. at 163.)

Pickens transferred to the Water and Sewer Department in 1992. John Grissom was director of the department. Between 1992 and 1995, Pickens heard Mangrum use the terms "nigger" and "nigger-rigged," and he heard Tomlinson tell a joke about AIDS coming from black people and monkeys. Other workers also told racial jokes.

6

In 1995, Pickens and other City employees were sitting in the shop area at the service center when the media reported the jury verdict in the O.J. Simpson case. The workers were angry and hollered, "Just hang him, hang him, hang him." Pickens saw Tomlinson start to make a noose out of a rope and Greg Roberson finished it. Pickens claims he heard the term "nigger" used in reference to the noose, but he admitted he heard someone say Simpson should be hung because he was guilty, not because he is black. (Pickens Depo. at 289.) Pickens walked out of the shop. When he returned, the rope was hanging over a beam in the shop. Pickens believed everyone, including supervisors Chip Brown and Richard Rigsby, saw the rope.

Pickens went to City hall to report the incident to Susie Hardin. She wanted to see the rope. Pickens returned to the shop after everyone had left and found the rope in a shop drawer. He put the rope in his City work truck, and intended to take it to City hall the next morning. The following day when he went to retrieve the rope from his truck, it was gone.

On another day, Pickens and Davis were sitting with Tomlinson and co-workers Ernie Martin and Danny Lampley, who were talking about how they had mistreated a black principal at their high school. They burned crosses in his yard and spat on him. They explained that state troopers had to transport the man to school.

7

When Pickens and Davis asked why they did that, they said they did not want him at their school. (Davis Depo. at 122-126.)

Pickens and Davis did not recall any specific incidents of racial harassment between 1995 and 2000, but Plaintiffs did overhear coworkers using the term, "nigger." In 2000, Pickens heard Mangrum make a derogatory comment about the Dr. Martin Luther King, Jr. holiday. Mangrum stated, "I don't know why they have a day off for that black man, because he never did nothing for nobody." (Pickens Depo. at 125.) Pickens asked him what he meant. Mangrum replied, "Well, hell, he ain't never did nothing for nobody." Pickens asked him who he was talking about, but Mangrum did not respond, only to refer to "that black guy." (Id. at 126-127.) Pickens complained to supervisor Lou Davio.

Plaintiffs and the City dispute whether Mangrum was disciplined for the remark. Mangrum attests that Lou Davio verbally counseled him about the inappropriateness of his comment, and thereafter, he did not make similar derogatory comments. (Docket Entry No. 88, Mangrum Aff. at ¶ 2.) Pickens testified he did not know if anyone talked to Mangrum about what he said, but Pickens learned Davio intended to suspend Mangrum for three days for the incident, but Mangrum was not suspended. (Pickens Depo. at 128-129.) Pickens did not hear Mangrum make any other derogatory comments about blacks. (Id. at 129.) Pickens could not recall any racial incidents between 2000 and 2002. (Pickens Depo. at 132.)

8

Davis recalls that, sometime around October 2001, co-workers peeled off safety stickers that were placed on the new City truck assigned to Davis and a white co-worker, Leo Mayne, and someone used hay twine to tie the steering wheel to the gear shift. (Davis Depo. at 207-210.) Davis reported the incident to his supervisor, Ray Mize, the same day. Kirk Bednar, the City's Assistant City Manager/Human Resource Director, learned of the hay twine episode several months after it occurred. Upon learning of the incident, Bednar contacted Mize and learned that Mize was aware of the hay twine incident, but Mize had been unable to identify the individual responsible for it. Davis admitted at his deposition that the workers were probably jealous because he and Mayne had a new truck to drive. (Davis Depo. at 210.)

On a day in early January 2002, Davis and Mayne stopped by the service center to eat lunch. Upon returning to their truck, Mayne found oil running out of the toolbox in the bed of the truck. The oil had not been there earlier in the day. Both Davis and Mayne believed the incident was related to Davis's race. Davis reported the incident to Mize, who thought that oil might have been spilled in the toolbox since oil is normally carried there. (Docket Entry No. 109, Davis Depo. at 213-219.) No other investigation was done. Mize attested he could not tell if the oil had been spilled accidentally or intentionally. (Docket Entry No. 89, Mize Aff. at ¶ 4.)

9

On Friday morning, January 25, 2002, Pickens was standing in the service center's shop area talking to Davis when Defendant Mark Ursery began calling Pickens' name, trying to get his attention. Pickens ignored Ursery, who then grabbed Pickens' buttocks and held on until Pickens turned around, grabbed Ursery by the neck, and pushed him away. Pickens told Ursery not to do it again. Ursery replied that Pickens "better be glad he took his medicine [otherwise] if he didn't, it would have been a big . . . fight[.]" (Pickens Depo. at 140.) Thereafter, according to Pickens, "everybody was mad" because he choked Ursery. (Id. at 259.)

Before the incident, Pickens had never had a problem with Ursery and had socialized with him once outside of work. He never heard Ursery make racial jokes or use racial epithets. (Id. at 286-287.) Pickens did not know why Ursery grabbed his buttocks, but he testified he believed it was not horseplay and was instead related to his race because of the other incidents that had occurred prior to 2000. Pickens went straight to the office and reported the incident to supervisor John Grissom, who agreed to talk to Ursery about it.

Around lunchtime, Pickens returned to the service center and saw Ursery, Grissom and Ken Waddy standing together laughing. Pickens could not hear what they were talking about, but figured it was about him because they quit talking when he walked up. Pickens then went to city hall and reported the incident to Kim Henry in

10

personnel because he thought Grissom was not going to do anything about it. Henry asked him if he thought it was racially motivated, and Pickens replied he thought it was. Bednar was not there and Pickens does not recall speaking with him about the incident. Henry told Pickens she would take care of it. Bednar directed the service center supervisors to inform all employees to stop such horseplay.

Around noon on the same day, Friday, January 25, 2002, Waddy flicked his open pocketknife as he walked past Davis and Greg Roberson, who is white. (Davis Depo. at 221-232.) Waddy did not make any racist comments as he did so, and Davis had not had any previous problem with Waddy. Most of the employees in the service center, including Davis, carried small pocket knives for work-related purposes.

That afternoon Grissom called a meeting to address the employees about horseplay, but Pickens testified the meeting centered on Grissom's concern that someone had gone over his head to city hall. There is some question whether the meeting Pickens remembered occurred on January 25 or January 31. Pickens was not grabbed or touched inappropriately after the incident with Ursery. (Pickens Depo. at 135-148, 155-161.)

Later that afternoon, while walking out the door to the parking lot, Waddy told Davis he would not flick his knife at him anymore; he stated knife-flicking was a habit up he picked up after

11

he quit drinking and smoking.  Davis then reported the knife-flicking incident to supervisor Grissom, but he did not tell Grissom he thought Waddy flicked his knife because Davis is black. Waddy never flicked his knife at Davis again.[2]

The following Monday morning, January 28, 2002, Davis opened the door of his work truck to warm it up and a stuffed gorilla fell out.  At first Davis thought it was a body and he was scared. Davis left the gorilla lying on the ground and went into the break room at the service center to try to find out who had put the gorilla in his truck.  When he returned to the truck, the gorilla was no longer on the ground.  Davis got in his truck and left to tend to work duties.[3]

---

[2]Pickens testified Waddy also flicked his knife at him as a racially threatening gesture, but the date of this event is not clear.  (Pickens Depo. at 196.)

[3]According to Cooper, an employee named King brought the gorilla to the service center over the weekend as the employees were finishing work for the day.  King suggested he should put the gorilla in someone's truck as a joke, possibly Davis's truck, because Davis and King were always joking with one another.  King asked Cooper which truck was Davis's and Cooper told him he did not know.  Cooper testified Davis was laughing about the gorilla when he went to the break room to find out who put it in his truck. Cooper picked the gorilla up from the ground where it fell out of Davis's truck and placed in the bed of his truck.  About mid-morning, he tied the gorilla to the back of the truck.  (Docket Entry No. 104, Cooper Depo. at 28, 30, 47.)

Bednar's written account of his investigation of this incident indicates Cooper and Waddy suggested to King that the gorilla be placed in Davis's truck.  When King placed the gorilla in Martin's truck, Cooper moved it to Davis's truck.  (Bednar Aff., Ex. 3 at 2.)

12

At lunchtime, Davis and Pickens returned to the service center and saw the gorilla tied to the back of Billy Cooper's and Mark Ursery's truck. The gorilla, about sixteen inches in height, appeared to be sitting on top of the toolbox. Latex gloves had been placed on the gorilla's hands, its right arm was in the air, and the gorilla appeared to be waving. According to Pickens and Davis, the gorilla was held in place by a bungee cord across its neck. At his deposition, Cooper admitted he tied the gorilla to the truck, but twice denied that he used a bungee cord. (Cooper Depo. at 33, 45.) He testified he ran wire marker flags through the gorilla's arms and wound them around the truck's two-way radio antenna, and put gloves on the gorilla. (Id. at 33-34.) After his deposition, Cooper provided an Affidavit in which he attested that he attached a bungee cord across the legs (or "lap") of the gorilla so that it would look like it was sitting. (Docket Entry No. 94-5, Cooper Aff. at ¶ 8.)

During lunch break, Cooper heard from one or more co-workers that a supervisor, either Grissom or Ricky Shell, wanted him to remove the stuffed gorilla from the truck. Cooper did not immediately remove the gorilla. (Cooper Depo. at 36.) When Cooper and Ursery left the service center after lunch on a service call, the gorilla was still in place. Pickens testified he was driving on Concord Road when Cooper swerved his truck in front of him and Cooper and Ursery pointed at Pickens and the gorilla and laughed.

13

Cooper removed the gorilla from the truck after he completed the service call, tossed it in the truck, and later threw it into the dumpster upon returning to the service center. (Cooper Depo. at 36-38.)

Pickens, Davis and other black employees viewed Cooper's and Ursery's conduct as a racial insult and they were upset by the incident. Pickens thought their actions were racially motivated because one time he had heard Tomlinson say that black people came from monkeys. (Pickens Depo. at 306-307.) Davis testified that seeing the gorilla strapped on the truck reminded him of his youth when blacks were forced to ride in the beds of pickup trucks in cold, wet weather while whites rode in the heated cabs. One of Davis's friends became ill and died after he was forced to ride in a pickup bed during cold weather. After the incident, white co-workers refused to associate with Davis. (Davis Depo. at 39.)

During lunch, Pickens snapped a Polaroid picture of the truck with the gorilla attached. (Plaintiff's Ex. 1.) He took the photo with him to city hall to complain to Kim Henry, Bednar's assistant. According to Pickens, Henry told him "it probably was revenge about when they grabbed me on my butt and I told it." (Pickens Depo. at 175.)

Upon learning of the gorilla incident, Bednar met with Cooper, Ursery, Grissom, Shell, and other employees who saw the gorilla on the truck. Bednar placed his findings in a written memorandum. At

14

that time, he was not aware the gorilla had ever been in Davis's truck. Cooper denied any racist intent and testified he thought it would be funny to have the gorilla waving as he drove the truck. He had previously seen a stuffed animal attached to the front of a Nashville Electric Service utility truck. Bednar told Cooper he should not have put the gorilla on the truck. (Bednar Depo. at 28.) Bednar spoke to the supervisors and Cooper about the need to be sensitive to the fact that unintentional actions of some can sometimes be perceived differently by others. Later that week, Grissom and Richard Rigsby verbally reprimanded Cooper about the inappropriate use of a City vehicle. The disciplinary action was later changed to a two-day suspension without pay when Bednar learned that Cooper had been instructed to remove the gorilla and failed to do so in a timely manner.[4]

Later in the same week that the gorilla episode occurred on Monday, Ken Waddy approached Davis as he sat in the break room and wanted to know why Davis told Mark he was a racist. The parties dispute what transpired next. According to Davis, Waddy threatened his life by stating that, if he was going to do anything to hurt Davis, he would not use a knife, he would shoot him. Defendants apparently contend Davis told Waddy he was faster with a knife than

---

[4]The City ultimately terminated Cooper's employment in August 2004 at a time when both Plaintiffs were still employed by the City.

Waddy, and that is why Waddy told Davis he would use a gun if he intended to hurt Davis. (Davis Depo. at 277-280.)

In the same week, on Friday, February 1, 2002, Pickens had a verbal altercation with Cooper. Following that incident, supervisor Grissom held a meeting with Pickens and Cooper. Grissom's intent was to settle the issues remaining between Cooper and Pickens because of the gorilla episode. Pickens admits that he was angry and upset during the meeting and he raised his voice. Pickens testified Grissom told him to shut up and sit down, and he responded, "I don't appreciate your telling me to shut up and sit down." Pickens denied that Grissom asked him to sit down or that he responded, "No white son-of-a-bitch is going to tell me to sit down." (Pickens Depo. at 184; Bednar Depo. at 58.) Grissom attested that Pickens stormed out of the meeting and the situation could not be discussed, so he terminated Pickens' employment on the ground of insubordinate behavior during the meeting. (Docket Entry No. 90, Grissom Aff. at ¶ 7.) Pickens testified he believed his termination was based on his race. (Pickens Depo. at 187.)

Pursuant to the City's Personnel Rules and Regulations, Pickens appealed his termination to City Manager, Mike Walker. At the appeal hearing, Pickens was represented by an attorney. Based upon review of the written and oral information made available at the hearing, Walker reversed the termination decision and reinstated Pickens. While Walker believed Pickens' behavior did

16

rise to the level of insubordination, Walker felt that termination of employment was too severe. Walker imposed a two-week suspension without pay and loss of eligibility for an annual merit pay adjustment. Pickens concedes Walker's action in disciplining him was not racially motivated, (Pickens Depo. at 198), but he points to Grissom's statement to Davis that "Mark's black ass is going to be out of here" as evidence of the City's racial discrimination. (Davis Depo. at 115, 117.)

In February 2002 Pickens and Davis submitted letters to city hall outlining their complaints of racial harassment. Following receipt of the letters, Walker asked Bednar to conduct a more thorough investigation into the gorilla episode and any other possible racial concerns at the service center. Bednar met with Davis to discuss with him any and all concerns he had regarding his work environment. Bednar also met with other black employees who worked at the service center in an effort to determine the extent, if any, of racial concerns at the service center.

In response to Plaintiffs' complaints, the City took the following actions: (1) all service center employees were advised by their respective department heads that inappropriate jokes, comments, horseplay, etc., in the workplace would not be tolerated; (2) the appropriate department heads met with Davis and Waddy concerning the knife-flicking incident and the subsequent lunchroom conversation in an attempt to alleviate Davis's concerns about

17

Waddy's motives or intentions and to make it clear to all involved what is not acceptable behavior in the workplace; (3) Cooper was disciplined for placing the gorilla on the City vehicle; and (4) the City Manager met with all service center supervisors to clearly express his expectations of how they should respond to any inappropriate behavior in the workplace. Additionally, a class the Human Resource Department had planned to conduct in April 2002 for supervisors on identifying and responding to workplace harassment was moved up and conducted in March 2002 instead. Plaintiffs suggest the training was only two hours long and purportedly dealt with all Title VII issues, race, sex and religion. Plaintiffs deny that Cooper received appropriate discipline for the gorilla incident and also deny that disciplining only Cooper for the gorilla incident was an appropriate response.

On February 14, 2002, Grissom, Shell, Superintendent Jeff Donegan, and Mize met with Davis and Waddy in an attempt to "clear the air" about the knife-flicking incident. (Docket Entry No. 90, Grissom Aff. at ¶ 5.) According to Mize, during the meeting both Davis and Waddy indicated they had no problems with the other and wanted to forget the episodes. (Mize Aff. at ¶ 5.) Everyone

signed the memorandum of the meeting except for Davis.[5]  (Id., Ex. 1.)

In May 2002, Davis complained that his personal car and truck were "keyed" or scratched.  He reported the scratch on his car to Mize, and a city police officer was sent to investigate.  (Mize Aff. at ¶ 7.)

On June 24, 2002, Davis complained to Bednar that Tomlinson got in his face and said, "Boy, don't you holler at me."  When Davis said he was not a "boy," Tomlinson replied "I'll call you a boy any damn time I want to."  Although Mize attests that he verbally counseled Tomlinson for this incident, Davis claims Tomlinson was not disciplined.

In January 2003, Davis and Pickens found a .22 caliber bullet on the bench between their lockers in the locker room.[6]  The bullet was pointing at Davis's locker, and Davis felt the bullet was directed to him.  Davis was so upset he started to cry and he was shaking.  Pickens was also upset.  (Pickens Depo. at 204-205.)  The City's Chief of Police, Ricky Watson, and Corporal Allen Hardcastle responded to a call to investigate the matter, and a police report

---

[5]Mize attests that Bednar wanted Donegan and Mize to meet informally with Davis on a weekly basis for the following few months to address any continuing concerns.  These meetings did not continue because Davis explained his attorney did not want him to continue such discussions.  (Mize Aff. at ¶ 6.)

[6]Davis recalled that the bullet incident occurred on January 9, 2002.  (Davis Depo. at 94.)

19

was made. The bullet was too small to take fingerprints from it. Watson held a meeting with City personnel and asked "if someone had done that to come forward," but no one did. Watson did not take any other steps to try to find out how the bullet got on the bench. It was never determined whether the bullet was intentionally placed in the locker room or whether it simply fell out of someone's pocket.

Pickens complained in January 2003 that the brakes of the city truck he was driving malfunctioned. (Pickens Depo. at 217-218.) Ricky Shell, a supervisor, instructed Pickens to drive the truck back to the service center slowly. The truck was taken back to the dealer for repair. Bednar spoke with the dealer's service manager and learned there was a master cylinder defect in the brakes and no evidence of tampering was present. The repairs were covered by a warranty. Bednar concluded there was no sabotage or tampering with Pickens' work truck. Pickens can produce no proof of tampering, but he believes the brake failure was racially motivated in some way because the brakes have failed on three separate occasions. (Pickens Depo. at 219-220.) Pickens talked to Chief Watson about possible brake tampering, but Watson wanted to know how much money it would take to get Pickens to leave the City. According to

20

Pickens, Watson said something like, "You might win the battle, but you'll lose the war."[7]  (Id. at 222-223.)

Davis claims his lack of promotion to the position of Maintenance Worker II was racially discriminatory.  The parties do not dispute, however, that to be promoted to Maintenance Worker II, an employee must have a high school diploma.  It is further undisputed that Davis did not obtain a high school diploma and he was not eligible for a Maintenance Worker II position.  Moreover, a white co-worker, Eric Forrest, did have a high school diploma and he was eligible for a Maintenance Worker II position; and other white co-workers, Billy Goodrich, Randy Goodrich, and John House were not promoted to Maintenance Worker II.

Before the gorilla episode, Davis enjoyed his job and the work he performed for the City, he did not suffer any stress at work, and he did not have any trouble completing his job duties.  (Davis Depo. at 13, 181.)  He became "stressed at work" only after the gorilla incident in January 2002.  Pickens testified he "liked what he was doing" the entire time he was employed at the City, and he

_____

[7]Watson's version of this conversation is that he asked Pickens "What's it going to take to make you happy?" because he was trying to resolve the situation and "get him to be a good employee." (Watson Depo. at 33.)  Pickens replied, "Well, I want a million dollars out of this."  Watson said, "I don't think they're going [to] give you a million dollars."  (Id. at 32-33.)  When Pickens indicated he was going to court to get the million dollars, Watson stated, "you just need to be cautious.  I said, you know, if you choose to leave here, . . . a lawsuit has a deterrent effect on you getting other employment."  (Id. at 33.)

21

enjoyed his job between fifty (50) and sixty (60) percent of the time. Since 2002, Pickens claimed he stayed nervous all of the time, had anxiety attacks and headaches, stomach problems, and could not sleep, but his nervousness did not affect his ability to do his job. (Pickens Depo. at 231-232, 269-270, 276.)

Defendant Ursery and the City now move for summary judgment on all claims against them. Defendant Cooper moves to dismiss the claims against him for failure to state a claim, Fed.R.Civ. P. 12(b)(6), or for summary judgment. Because the Court will consider facts outside the pleadings, the Court construes Cooper's motion as one for summary judgment.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

22

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

**A. Counts I & IV - Title VII and THRA claims against the City**

Plaintiffs filed administrative charges with the Equal Employment Opportunity Commission ("EEOC") on August 8 and August 15, 2002, alleging discrete acts of racial discrimination and the existence of a racially hostile work environment. The City contends the incidents of claimed racial discrimination and harassment that occurred prior to October 2001 are time-barred and are not actionable under Title VII. Moreover, Plaintiffs' claim

23

brought in Count IV for deprivation of employment opportunities under the THRA is subject to a one-year statute of limitations. Tenn. Code Ann. § 4-21-311(d). The substance of claims brought under the THRA are analyzed similarly to claims brought under Title VII. See Spicer v. Beaman Bottling Co., 937 S.W.2d 884 (Tenn. 1996); Bruce v. Western Auto Supply Co., 669 S.W.2d 95, 97 (Tenn. Ct. App. 1984).

### 1. Discrete acts of alleged racial discrimination

A discrete act of discrimination "occurs" on the day the event "happened." See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002). Thus, the Court agrees that, under Title VII as alleged against the City in Count I, only those discrete acts of discrimination which occurred after October 2001 are timely brought within the 300-day statutory time period of Title VII. See id. Any acts prior to October 2001 are time-barred under Title VII and are not actionable under Morgan. Additionally, any claims for discrete acts of discrimination brought under the THRA are time-barred if they occurred before December 19, 2002, one year before this suit was filed on December 19, 2003.

Plaintiff Davis claims the City failed to promote him from a Maintenance Worker I to a Maintenance Worker II position. It appears Davis claims he was denied promotion throughout his twenty-year employment with the City, even after October 2001 until his retirement in May 2005.

24

To demonstrate a *prima facie* case of failure to promote, Davis must show that (1) he is a member of a protected class, (2) he applied for and did not receive a job, (3) he was qualified for the job, and (4) a similarly situated person who was not in Plaintiff's protected class received the job. See <u>Anthony v. BTR Automotive Sealing Sys., Inc.</u>, 339 F.3d 506, 515 (6th Cir. 2003). Davis cannot establish the third and fourth elements. The proof is undisputed that he did not have a high school diploma, and thus, he was not qualified for the position of Maintenance Worker II. Moreover, Eric Forrest, a white employee who was promoted to Maintenance Worker II, was qualified for the position because he had a high school diploma. The other three white employees to whom Davis compares himself, Billy Goodrich, Randy Goodrich, and John House, were not promoted to the Maintenance Worker II position. Consequently, Davis has not generated a genuine issue of material fact for trial on this claim, and the City is entitled to summary judgment.

Plaintiff Pickens claims that he was demoted from the position of supervisor in the Parks Department in 1994 when Roy Spooner, a white employee, was given the position. Pickens did not file an EEOC charge until August 8, 2002. Even assuming Pickens was actually demoted from a supervisory position, such an adverse employment action is time-barred under Title VII and the THRA.

25

Pickens further contends he was constructively discharged for a pretextual reason when his employment was terminated by John Grissom, Director of the Water & Sewer Department, in February 2002 for insubordination during a meeting.[8]  This claim is time-barred under the THRA.  It is timely brought, however, under Title VII. Plaintiff has not shown that he was constructively discharged, that is, that he was forced to end his employment with the City because of the alleged discrimination he suffered.  Pickens appealed Grissom's termination, and City Manager Mike Walker reversed the termination as too severe.  Walker instead imposed a two-week suspension without pay, and rendered Pickens ineligible for a merit raise that year.  The suspension with loss of pay constitutes an adverse employment action.  See Kocsis v. Multi-Care Mgt., Inc., 97 F.3d 876, 886 (6th Cir. 1996).  Plaintiff does not dispute, however, that Walker's decision to allow Pickens to keep his job and to lessen the disciplinary sanction did not result from discrimination based on race.  Pickens did not resign, but kept working in the same position.  Accordingly, the Court concludes that Plaintiff has not come forward with sufficient evidence to prove a constructive

_____

[8]This claim and Davis's claim of constructive discharge to be addressed below were not included in the First Amended Complaint and are improperly raised as new claims in Plaintiffs' response to the City's motion for summary judgment.  The claims could be rejected solely on the basis of failure to plead.  In the interest of completeness, the Court will address the claims.

26

discharge.  <u>Kinamore v. EBP Elec. Utility</u>, 92 Fed. Appx. 197, 204-205 (6th Cir. 2004) (unpublished).

Davis claims he was constructively discharged because he retired as soon as he reached age 65 and completed twenty years of service.  The Sixth Circuit has held that one factor that may be considered in deciding if an employee was constructively discharged is whether the employer offered early retirement or continued employment on terms less favorable than the employee's former status.  <u>Logan v. Denny's, Inc.</u>, 259 F.3d 558, 569 (6th Cir. 2001). The evidence does not show that the City forced Davis to retire early.  Rather, at the time of Davis's deposition in this case in July 2004, Davis testified he would complete twenty years of service with the City in April 2005 and he would turn 65 years of age in May 2005.  Davis was still working for the City, aiming to reach his retirement age.  Davis testified his wife encouraged him to end his employment before he reached retirement because of the alleged racial discrimination, but Davis told her he would not run away from his job, and he stayed until he was eligible for retirement.  (Davis Depo. at 113-114.)  Davis has not shown that he was constructively discharged.

Therefore, Pickens and Davis have not generated genuine issues of material fact for trial as to any adverse employment actions, and the City is entitled to summary judgment.

## 2. Racially hostile work environment

Plaintiffs' claims against the City for relief under Title VII and the THRA for an allegedly hostile work environment based on race are analyzed differently from discrete acts under Morgan. "[H]ostile work environment claims involve unlawful employment practices that cannot be said to occur on any particular day, but occur over a series of days or years." Sharpe v. Cureton, 319 F.3d 259, 267 (6th Cir. 2003).

The City contends that Plaintiffs cannot recover for any part of the allegedly hostile work environment that occurred before October 2001. To overcome the statute of limitations defense, Plaintiffs emphasize they were subjected to a continuing violation of their civil rights, and accordingly, all of the incidents which contributed to the allegedly hostile work environment based on race from 1988 until Pickens' termination in November 2004 and Davis's retirement in May 2005 are admissible.

Before Morgan, the Sixth Circuit recognized two distinct categories of continuing violations: those alleging serial violations and those identified with a longstanding and demonstrable policy of discrimination. Sharpe, 319 F.3d at 266. The Tennessee Supreme Court, like the Sixth Circuit, also recognized a continuing violation exception for a longstanding and demonstrable policy of discrimination. See Spicer, 937 S.W.2d at 889-890.

28

In deciding <u>Morgan</u>, the Supreme Court overturned prior Sixth Circuit law on serial violations. <u>Sharpe</u>, 319 F.3d at 268. The second category, for a longstanding and demonstrable policy of discrimination, was not implicated by <u>Morgan</u>. <u>Id.</u>; <u>Bell v. Ohio State Univ.</u>, 351 F.3d 240, 248 (6th Cir. 2003). Because the Tennessee Supreme Court analyzes discrimination cases in light of similar federal law, <u>see</u> Tenn. Code Ann. § 4-21-101; <u>Bruce</u>, 669 S.W.2d at 97, the Court concludes that <u>Spicer</u> is also still good law after <u>Morgan</u>.

Plaintiffs suggest they were subjected to a longstanding and demonstrable policy of discrimination.[9] Even so, other than their contentions that they individually suffered racial discrimination, Plaintiffs have not presented sufficient proof by a preponderance of the evidence that the City's standing operating procedure was some form of intentional discrimination against the racial class as a whole of which Plaintiffs are members. <u>See</u> <u>Sharpe</u>, 319 F.3d at 268-269. Plaintiffs have not presented any evidence, let alone

---

[9]Plaintiffs actually state they have pled a "pattern or practice" case of systemic disparate treatment, but as the City points out, the Sixth Circuit does not permit individual plaintiffs to prove discrimination through the "pattern or practice" method of proof; that method may be used only in class actions or suits by the EEOC. <u>See</u> <u>Bacon v. Honda of Am. Mfg., Inc.</u>, 370 F.3d 565, 575 (6th Cir. 2004). "However, pattern-or-practice evidence may be relevant to proving an otherwise-viable individual claim for disparate treatment under the <u>McDonnell Douglas</u> framework." <u>Id.</u> Here, the Court has already concluded that Plaintiffs' individual claims for disparate treatment are time-barred or lacking in proof of the merits such that the City is entitled to summary judgment on them.

29

sufficient evidence, of a continuing, over-arching policy of discrimination against African American workers as a class. See Sharpe, 319 F.3d at 269; Burzynski v. Cohen, 264 F.3d 611, 618 (6th Cir. 2001). Cf. Alexander v. Local 496, Laborer's Int'l Union, 177 F.3d 394, 408 (6th Cir. 1999). Thus, this case does not fit neatly within the second continuing violation theory. In the view of the Supreme Court, however, it does not matter, for purposes of Title VII,

> that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. [footnote omitted]
> That act need not, however, be the last act. As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.

Morgan, 536 U.S. at 117. The Court's task "is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Id. at 120.

The City devotes a large portion of its brief to parsing the various incidents in an effort to convince the Court that the later acts alleged by Plaintiffs have no relation to the earlier acts and are not part of the same hostile work environment claim, or that the incidents alleged were not racial in nature. The City points

30

to the significant gaps in time for which the Plaintiffs could not produce any evidence of racial incidents or episodes.

Although Plaintiffs could not recall any specific instances of allegedly racial harassment directed toward them between 1996 and 2000, they did testify they heard use of the word "nigger" in the workplace during that period. Between 2000 and 2002, the City disciplined an employee for making a derogatory comment about the holiday for Dr. Martin Luther King, Jr. Many of the same individuals who were employed at the City when the earlier events occurred between 1996 and 2000 were still employed when the later events happened between 2000 and 2005.

Thus, the Court concludes this case is similar to Morgan. As in that case, the Plaintiffs produce sufficient evidence that the pre- and post-limitations period incidents involved the same types of conduct, occurred relatively frequently during the two time periods at issue (1988-1995 and 2000-2005), and were perpetrated by many of the same individuals. Plaintiffs have produced evidence of racial jokes, racially derogatory acts, and use of racial epithets. Id. Davis testified in his deposition about the racially hostile workplace environment. For example, he stated, ". . . that's all you hear is talk about black, black and racist the way they done people. And see, they would talk about that every day. . . . But you go up there and then you talk to his supervisor, where else you got to go to? . . . You've got to be afraid, what's going to happen

31

to you? . . . you hear it all the time about niggers. . . Not every, every day, but you . . . might hear it two or three times a week. . . . It started in '89." (Davis Depo. at 233-234.) Although many of the acts upon which the hostile work environment claim depends occurred outside the 300-day filing period for Title VII and the one-year limitations period applicable to the THRA, the Court "cannot say that they are not part of the same actionable hostile environment claim." See id. The Court concludes the acts alleged in the two time periods are sufficiently related to form one continuous hostile work environment. See Wheaton v. North Oakland Med. Ctr., 130 Fed. Appx. 773, 2005 U.S. App. LEXIS 8159 at *38-41 (6th Cir. 2005). The gorilla episode occurred within Title VII's 300-day filing period. Plaintiffs claimed that discriminatory conduct continued into 2003. Thus, Plaintiffs' hostile work environment claim, beginning in 1989 and continuing until suit was filed, is not time-barred under Title VII or the THRA.

Next, the City contends that Plaintiffs have not come forward with enough evidence to meet the elements of their racial harassment claim. To proceed on a cognizable hostile work environment claim, each Plaintiff must prove five elements: (1) he was a member of a protected class; (2) he was subject to unwelcome racial harassment; (3) the harassment complained of was based on race; (4) the harassment had the effect of unreasonably interfering

32

with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer may be held liable under the law. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999). In the City's view, Plaintiffs fail to carry their burden on the third, fourth, and fifth elements. The City defends on the ground that, looking at the totality of the circumstances, the workplace was not permeated with discriminatory intimidation, ridicule and insult which was sufficiently severe or pervasive to alter the conditions of the Plaintiffs' employment and create an abusive working environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Morgan, 536 U.S. at 116, n.10. Rather, at most, Plaintiffs were subjected to simple teasing and isolated incidents which did not amount to discriminatory changes in the terms and conditions of employment. See Faragher v. City of Boca Ratton, 524 U.S. 775, 788 (1998).

The Court acknowledges that, if complained of behavior is not overtly or patently racial, Plaintiffs must present sufficient evidence to create an inference that, but for race, the behavior would not have been undertaken. See Mast v. IMCO Recycling of Ohio, Inc., 58 Fed.Appx. 116, 118 (6th Cir. 2003). But here, taking all of the facts in the light most favorable to the Plaintiffs, the Court concludes that sufficient inferences have been drawn. It is for a jury to decide whether the "butt-grabbing" incident, the gorilla episode, and all of the other claimed incidents which

33

occurred both before and after were based on Plaintiffs' race, particularly in light of the evidence of employees' use in the workplace of racial epithets, use of the word "boy," see Ash v. Tyson Foods, Inc., — U.S. —, 126 S.Ct. 1195, 1197 (2006), and derogatory statements about African Americans. Plaintiffs testified they suffered stress that affected the conditions of their employment. According to the Plaintiffs, Davis started taking anti-stress medication after the stuffed gorilla incident; his blood pressure has risen; he has nightmares; he is sometimes depressed; and he has sought counseling to cope with his racial problems at work. Plaintiffs produced sufficient evidence to create genuine issues of material fact for trial on whether they were subjected to a racially hostile work environment. The City's motion for summary judgment on this claim will be denied.

**B.  Count II - 42 U.S.C. § 1981 claims against all Defendants
Count III - 42 U.S.C. & 1983 claim against the City**

In Count II, Plaintiffs assert claims of racial discrimination and harassment against all Defendants under 42 U.S.C. § 1981. Claims brought under § 1981 are subject to a four-year statute of limitations. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S.Ct. 1836, 1842-1845 (2004); Anthony, 339 F.3d at 514. This lawsuit was filed on December 19, 2003. Thus, under § 1981, any discrete acts of racial discrimination which Plaintiffs claim occurred more than four years earlier, before December 19, 1999, are time-barred under § 1981. As to Plaintiffs' claim of a

34

racially hostile work environment, the <u>Morgan</u> analysis outlined above applies equally to the § 1981 claim. <u>Kinley v. Norfolk Southern Railway Co.</u>, 230 F. Supp.2d 770 (E.D. Ky. 2002) (cited in <u>Sharpe</u>, 319 F.3d at 267-268 n.6.) Therefore, the § 1981 racial harassment claim is timely and Plaintiffs have generated genuine issues of material fact for trial on the racial harassment claim.

The statute of limitations applicable to a § 1983 action is the state's personal injury statute of limitations. <u>Wilson v. Garcia</u>, 471 U.S. 261, 276-280 (1985); <u>Dixon v. Anderson</u>, 928 F.2d 212, 215 (6th Cir. 1991). The State of Tennessee imposes a one-year limitations period for civil actions brought under the federal civil rights statutes. Tenn. Code Ann. § 28-3-104(a)(3). Because this suit was filed on December 19, 2003, Plaintiffs' civil rights claims under § 1983 are limited to the period after December 19, 2002.

For the same reasons stated above with regard to Title VII, Plaintiffs' claims of disparate treatment in promotion (Davis), demotion (Pickens), and constructive discharge (Pickens and Davis) are either time-barred or Plaintiffs have failed to generate genuine issues of material fact for trial against the City.

In Count III, Plaintiffs allege that the City, through its policymakers and supervisors, maintained policies and customs of inadequate investigation of employee misconduct, failure to supervise and train City employees, and toleration of employee

35

misconduct, which resulted in violation of Plaintiffs' rights under Title VII, § 1981, and the Equal Protection Clause of the Fourteenth Amendment. Although the City argues that Plaintiffs have not produced sufficient evidence to show that the City *itself* actually caused deprivations of Plaintiffs' constitutional rights through its adoption of a custom, policy or practice of racial harassment against African Americans, see <u>Jett v. Dallas Indep. School Dist.</u>, 491 U.S. 701, 733-738 (1989); <u>Monell v. Dept. of Social Serv.</u>, 436 U.S. 658, 690-695 (1978), Plaintiffs' brushes sweep broader than that. Plaintiffs allege in the First Amended Complaint that the City failed to investigate their complaints, tolerated racial harassment, did not properly supervise or train employees, and allowed the workplace discrimination to continue. Plaintiffs have produced sufficient evidence of these alleged shortcomings to survive the summary judgment motion.

Taking the facts in the light most favorable to Plaintiffs, they complained to supervisors repeatedly of racial discrimination for many years, but little, if anything, was done until their complaints in early 2002 were investigated by Assistant City Manager Bednar. Even then, according to the evidence, the steps taken by the City did not stop the racial harassment. The City moved up the date of a training seminar for supervisors, but Assistant City Manager Bednar acknowledged that racial harassment training for employees was not done. Whether the City properly

36

investigated complaints and disciplined the perpetrators, whether the City tolerated a racially hostile work environment and whether the City adequately trained and supervised its employees are jury questions. Plaintiffs have done more than merely suggest that the City should be held liable for the actions of its employees under a theory of *respondeat superior*. See id. Consequently, Plaintiffs' claims against the City under §§ 1981 and 1983 will proceed and the City is not entitled to summary judgment.

Defendants Cooper and Ursery contend they cannot be held liable under § 1981 because they were mere co-workers of the Plaintiffs, and only supervisors may be held personally liable for racial discrimination or harassment under § 1981, citing Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000). Whidbee does not expressly preclude individual liability of a co-worker. The case holds that individuals may be held liable under § 1981 so long as the plaintiff proves an affirmative link to causally connect the actor to the discriminatory action. Id. at 75. See also Jones v. Continental Corp., 789 F.2d 1225, 1231 (6th Cir. 1986) (cited in Whidbee and stating, "[T]he law is clear that individuals may be held liable for violations of § 1981[.]"); Phillips v. Mabe, 367 F.Supp.2d 861, 869-870 (M.D.N.C. 2005) (and cases cited therein). Here, Plaintiffs presented evidence that Defendant Ursery was involved in the "butt-grabbing" incident with Plaintiff Pickens on January 25, 2002, and that both Defendant

37

Ursery and Defendant Cooper were involved in the gorilla episode on January 28, 2002. Accordingly, Defendants Cooper and Ursery are not entitled to summary judgment on the § 1981 claims against them.

## C. Count V - Intentional Infliction of Emotional Distress

Plaintiffs' state-law tort claim of intentional infliction of emotional distress brought against Defendants Cooper and Ursery is governed by Tennessee's one-year statute of limitations for personal injury claims. Tenn. Code Ann. § 28-3-104(a)(1). The intentional tort claims apparently rest on the "butt grabbing" incident involving Defendant Ursery and Plaintiff Pickens on January 25, 2002, and the gorilla episode involving both Plaintiffs and Defendants Cooper and Ursery on January 28, 2002. Potential recovery in tort for these incidents is barred by the one-year statute of limitations because the events occurred long before December 19, 2002, more than one year before this case was filed on December 19, 2003. Although Plaintiffs state they should be given the benefit of the discovery rule, Plaintiff Pickens knew on January 25, 2002 that Defendant Ursery had improperly grabbed him. Both Plaintiffs knew on January 28, 2002, that the gorilla was strapped on the truck being used that day by Defendants Cooper and Ursery. Pickens testified Cooper and Ursery drove the truck in front of him, pointed at the gorilla and laughed. Plaintiffs discovered their injuries in January 2002. Accordingly, the claims

38

are time-barred and Count V against Defendants Cooper and Ursery will be dismissed with prejudice.

## IV. CONCLUSION

To summarize, the Court will grant summary judgment in favor of the City on Plaintiffs' claims of disparate treatment based on race under Title VII, the THRA, and § 1981. The Court will also grant summary judgment in favor of Defendants Cooper and Ursery on the intentional infliction of emotional distress claims brought against them.

The Court will deny the City's motion for summary judgment on Plaintiffs' claims of a racially hostile work environment under Title VII, the THRA, and § 1981 and for alleged constitutional violations under § 1983. The Court will deny the motions of Defendants Cooper and Ursery to dismiss the § 1981 claim against them for racial harassment.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

39